WESTINGHOUSE AIR BRAKE CO. v. NEW YORK AIR BRAKE CO.

(District Court, D. New Jersey. March 28, 1912.)

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—AIR BRAKE VALVE.

The Turner patent, No. 912,511, for a triple valve device for automatic fluid pressure brakes, designed specially for use in making service stops with long trains, and known as the "K triple valve," was not anticipated and discloses invention, and the device is an improvement of practical utility; also held infringed.

2. PATENTS (§ 328*)—INVENTION—AIR BRAKE VALVE.

The Turner and Custer patent, No. 912,512, for a valve device for automatic fluid pressure brakes, held void for lack of novelty and invention.

In Equity. Suit by the Westinghouse Air Brake Company against the New York Air Brake Company for infringement of two patents. On final hearing. Decree for complainant on one patent and for defendant on the other.

Edward A. Wright, J. Snowden Bell, and Thomas B. Kerr, for complainant.

Charles Neave and William G. McKnight, for defendant.

CROSS, District Judge. The patents involved in this suit relate to triple valve devices for automatic fluid pressure brakes. The air brake art as applied to railroad cars has undergone a long period of development. There is first found in the art what was known as the "straight air brake," after that the "automatic air brake," then the "quick-action brake," and finally the type involved in the present controversy. A most interesting and instructive account of the earlier development of the art is set forth in the briefs of counsel, to which, however, it is unnecessary to refer in detail, since a sufficiently full

history thereof appears in Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 18 Sup. Ct. 707, 42 L. Ed. 1136. The bill of complaint herein sets up two patents of the complainant, both of which it alleges have been infringed by the defendant. The first, No. 912,511, was issued February 16, 1909, to one Walter V. Turner, assignor to the complainant. The second, No. 912,512, was issued on the same date to Walter V. Turner and John S. Custer, assignors to the complainant. Of these patents the first mentioned contains 21 claims, of which, however, only Nos. 1, 2, 3, 4, 5, 6, 7, 8, 11, 13, 14, 15, 19, and 21 are in issue. The second contains 18 claims 3 only of which, viz., 13, 15, and 16, are in issue. The defendant's answer denies the validity of both of the patents, and also denies their infringement. In support of the averment of invalidity, it sets up 49 patents, which it is claimed anticipate the first patent and 26 which it is claimed anticipate the second. Of this large number of alleged anticipations, reliance is ultimately placed upon but 3 or 4, and it can be said that the strength of the attack upon the first patent in suit is based upon No. 393,950, to one Williams, issued December 4, 1888, to which particular reference will later be made.

Before proceeding to a consideration of the patents in suit, it may appropriately be said that the automatic air brake system added an auxiliary reservoir, for containing compressed air, and a triple valve to the pump, main reservoir, engineer's valve, train pipe, and brake-cylinder of the straight air brake mechanism. Of the foregoing elements, the pump, main reservoir, and engineer's valve are located upon the engine. The train pipe passes under each car, and is provided with flexible couplings at its ends with which it is coupled with the train pipe of adjoining cars, while the auxiliary reservoir, brake-cylinder, and triple valve with the necessary pipe and connections for their effective use are located under each car. The system is called automatic because upon a reduction of the air pressure in the train pipe, either by the engineer, through the use of his valve, or by the parting of the train and consequent rupture of the train pipe, the brakes will be set. Indeed, an automatic application of the brakes follows any reduction of the air pressure in the train pipe for the reason that such a reduction causes a movement of the triple valve, whereby the compressed air stored in the auxiliary reservoir is permitted to pass therefrom into the brake-cylinder where its force is, by appropriate mechanical means, transmitted and applied to the brake shoes. The triple valve performs three functions: It controls the admission of the compressed air from the train pipe to the auxiliary reservoir to charge the system, the admission of compressed air from that reservoir into the brake-cylinder when the brakes are to be applied, and its discharge therefrom when the brakes are to be released. The automatic brake system just referred to was generally adopted and used from about 1879 to about 1888, when there was developed what has been called the "quick-action brake." This type, in addition to the apparatus of the automatic brake, added to the triple valve an auxiliary valve device actuated independently of the main valve of the triple, which on an emergency application of the brake locally discharged compressed air from the train pipe under

each car into the brake-cylinder. Formerly the air was vented only at the engine through operation of the engineer's valve, but by the improvement introduced into this type the opening of a local discharge port of considerable size from the train pipe on the first car into its brake-cylinder operated to set off, in turn, the triple valve of the second car, which likewise operated to discharge air from the train pipe to the brake cylinder of that car, which operation was thereby repeated on the third car, and so on successively through all the cars comprising the train, producing what came to be known as "quick serial emergency action." The special features of this type were embodied in patents Nos. 360,070 and 376,837, issued to George Westinghouse, Jr., in 1887 and 1888. And this improved brake came into general use throughout the United States, and was known as the H triple valve. But, while the patents just referred to embodied improvements of the greatest value in the application of brakes in cases of emergency, they failed to meet the requirements of ordinary train service which, because of the constantly increasing length, weight, and number of cars composing them, were continually becoming more exacting. The quick-action device, above alluded to, was specially adapted to emergency use, but it was not sufficiently sensitive and controllable for ordinary use in making service stops. Its applications in such cases would have been manifestly ill-advised and impracticable. The difficulties and disadvantages attending the use of the H triple valve in service applications as the number of cars in a freight train were increased from 40 or 50 to 80 or more are well and concisely set forth by one of the complainant's practical experts in the following language:

"The net result of the operation of the old H triple valve in service applications in long trains is to quickly build up a considerable brake force on the forward portion of the train before the brakes can begin to apply in the rear portion, this resulting in the slack of the train being bunched with sufficient force, in many instances, to produce shocks which damage cars and lading. Further, the partial or total loss of brake force in the rear portion of the train makes it impossible to stop such long trains with service applications within reasonable distances, unless very heavy brake pipe reductions are made, which heavy reductions are seriously objectionable, because of the very heavy brake forces developed in the front portion of the train, as compared with the rear, producing excessive shocks and damage to cars and lading."

From the testimony of the experts of both parties, it appears that the desirability of a quick-brake action in service applications, as well as in emergency applications, was recognized not long after the quick-action valve for emergency cases was introduced. In a service application it is not only desirable, but necessary, that the reduction of pressure in the train pipe should be measurably under the control of the engineer and capable of being halted, increased, or lessened by him at will, whereas in an emergency application the great desideratum is to obtain as full and prompt an application of brake power as possible. It is claimed for the patents in suit that they show the first and only practicable devices for graduated and controllable service applications of the brakes. That the problem to be met was real and difficult cannot, under the evidence, be successfully denied. In the practical solution of the question, it was necessary to find

means whereby brake pressure could be applied gradually, serially, and controllably throughout the cars composing the train.

[1] The general character and purpose of patent No. 912,511, as found in the specification, are described as follows:

"This invention relates to triple valve devices for automatic fluid pressure brakes, and has for its object to provide an improved means embodied in said valve device for securing a local discharge of train pipe air at each triple valve in service applications of the brakes, and thereby accelerate the action of said valves throughout the train.

"In the standard air brake apparatus, as at present in use, a service application of the brakes is produced by making a gradual reduction in train pipe pressure at the train pipe discharge valve on the locomotive, consequently all of the compressed air which is vented from the train pipe to produce the desired reduction in service application must be discharged at the front end of the train pipe, thereby causing a very slow reduction in pressure at the rear end of the train, due to the expansion of the air toward the forward end, and a correspondingly slow action of the rear triple valves in service applications, especially on long trains. This is an objectionable feature of the apparatus in practice, and my improvement is designed to overcome this defect by providing a triple valve device having means for automatically venting fluid under pressure from the train pipe locally upon each car in service applications, and thereby hasten, by the well-known serial action, the movement of each succeeding triple valve, and the complete service application of the brakes."

The Turner patent, it should be mentioned, also retains in substantially its old form the emergency devices to which allusion has already been made. This clearly appears from a reading of the specification. It would be impossible to set forth specifically and in detail what this patent did, without a substantial reproduction of its drawings and specification. No better general description, however, of what it accomplished can be given than was given by one of complainant's experts in the following language, which, after careful examination, is adopted as showing in a general way the utility of Turner's invention.

"The quick-service feature of the K triple valve operates to vent air from the brake pipe locally under each car in a train, during service applications of the brake, and accomplishes this in a manner and under such control as to absolutely prevent any liability of the triple valve and brake being operated in undesired quick action emergency. This local vent of brake pipe pressure very materially reduces the volume of air to be discharged through the service ports of the brake valve, during service application, causes the brakes to operate serially in service application throughout the train, almost wholly eliminates the back flow of air from the auxiliary reservoirs to the brake pipe by causing the triple valves to move to their service application position promptly, and practically eliminates the loss of air from the brake-cylinder to the atmosphere through the leakage grooves of the brake-cylinder, by quickly admitting a sufficient volume of air to the brake-cylinder to produce a prompt movement of the brake-cylinder pistons to a point where the leakage grooves are closed.

"The prompt response and effective operation of brakes in long trains, brought about by the operation of the quick-service feature of the K triple valve, makes it possible and practicable to apply all brakes in service applications with comparatively light brake pipe reductions, and produces a practically uniform brake force throughout the train. As a result, the brake-cylinder pressure, and therefore the brake force, developed in any portion of the train, is not sufficient to produce damaging slack action, and the prompt development of an efficient braking force in the rear portion of the train further assists materially in preventing serious slack action.

"The effective and uniform brake force developed in long trains by the K triple valve with comparatively light brake pipe reductions makes it possible to control trains fitted with the K triple valve with very much lighter brake pipe reductions than are required with the type H triple valve, thus holding in reserve a much larger amount of available brake force with K triple valves than with the old H. This reserve of brake force accompanying the use of the K triple valve may be utilized to materially shorten the service stop, if circumstances should make this necessary or desirable, or to permit more frequent applications of the brakes than is possible with the type H. triple valve without seriously depleting the air pressures.

"Another very valuable feature, in connection with the control of long freight trains fitted with type K triple valves, is that, owing to the effective brake force developed throughout the train with light brake pipe reductions, the brake pipe reductions normally required are not sufficient to prevent the starting and transmissions of quick-action emergency operation of the brakes at any time that such brake action may be found necessary on account of danger to the train."

The patent under consideration involved, among others, the following novel features: That the train pipe vent port should be of much smaller capacity than the service port from the auxiliary reservoir to the brake-cylinder; that the said ports should open practically simultaneously, or, as stated in the specification, the train pipe vent port should begin to open "preferably slightly in advance of the service port," nevertheless it was requisite that there should be a period in which the ports should be open concurrently in the service position of the valve; that the auxiliary valve upon its return or lap movement should be adapted to close the vent port in advance of the service port in the valve, and, lastly, means were provided of the character and for the purpose mentioned in the following extract from the specification:

"In order to prevent any tendency of the piston and valve to go to emergency position in service applications on short trains, due to the local train pipe discharge, the graduating port 11 in the main slide valve is provided with a foot or extension 25 in the face of the valve, so that the first movement of the main valve from its service position toward emergency position operates to cut off the local train pipe discharge, while at the same time maintaining the service port from the auxiliary reservoir to the brake-cylinder open to its full capacity. The train pipe discharge being closed, the auxiliary reservoir pressure will then reduce to the brake-cylinder with sufficient rapidity to prevent further movement of the valve, toward emergency position, as will be readily understood."

The foregoing special features or characteristics of the Turner patent have been, for the most part, clearly and satisfactorily shown by colored drawings used at the argument. They are, moreover, covered by the claims in issue, and are not substantially or practically disclosed by the prior art.

It is, however, contended on behalf of the defendant that all that Turner did had been fully disclosed in the prior art, and that from such disclosures any mechanic skilled in the art could readily have accomplished all that Turner did. In considering an invention of this character, however, it must be kept in mind that the relative location of the ports and passages and the timing and extent of the relative movements of the valves are of vital importance. That invention may be found in changes of that character is evident from the multitude of like patents which have been issued and sustained.

Indeed, no improvements in air valves could be made otherwise than by changing the relative size, movement, and position of the various valves, ports, and passages. A single addition, omission, enlargement, contraction, or relocation of a port or passage may make or ruin, as the case may be, the device. The problem was an open one for several years, and Turner successfully solved it. His invention has been generally adopted, and in 1910 more than 229,000 of the valves had been put in practical use at a cost of nearly $3,000,000.

The application for patent No. 912,511 was filed January 15, 1904, and the patent issued, as already stated, February 16, 1909. During the pendency of the application and down to 1905 or 1906, the complainant, according to the testimony, was diligently engaged in testing the device and putting it in shape for practical and commercial use, and expended in such work during that period approximately $100,000. It further appears that prior to 1909 the defendant claimed that it produced the same or better results by the use of the old H triple valve, coupled with what it called an accelerator valve, which was made a part of the engine equipment, without providing a local vent for each car of the train. This claim was urged, notwithstanding that most or all of the patents which the defendant now claims anticipate and render invalid the Turner patent had then expired. Shortly after the defendant's device had been demonstrated to be inferior to that of the complainant's, whereby the defendant had lost important contracts, it began to manufacture and sell the complainant's device under the same name that the complainant had adopted, viz., the K triple valve. It also adopted to some extent in advertising circulars the language used by the complainant in its advertisements. This is relatively unimportant, except that it tends to show a willingness on the part of the defendant to appropriate the fruits of the complainant's enterprise and to adopt that which, once its merits had been established by competitive trial, it had previously ignored, but had a perfect right to use, if, as now claimed, previously expired patents covered it. Under the circumstances, it is well nigh incredible that it did not promptly seek in the prior art what it now claims was so transparently disclosed.

At the argument the defendant made reference to the Williams patent, 393,950, of 1888, already referred to and also to the Dixon patent, 402,418, of 1889, the Moore patent, 453,154, of 1891, and the Noyes patent, 599,348, of 1898, as anticipating and invalidating the Turner patent. Its main dependence, however, was placed upon the Williams patent, and accordingly more attention will be given to that than to the others above mentioned.

At the outset, however, it may be said of one and all of them that, so far as the record shows, they are all paper patents. To this, however, the defendant replies that they were not used because there was no demand for their use, and that such demand first arose when freight trains had been practically doubled in length by increasing the number of cars from 40 or 50 to 80 or 100. The evidence does not, however, support any such inference. There certainly was an existing urgent demand for an extension of the Westinghouse emergency

device to ordinary train service stops years before the alleged antie-cipatory patents expired, and it is hard to believe that had any of them met that want it would not forthwith have been adopted and used, and the fact that it was not gives rise to a strong presumption that no one of them was deemed capable of practical use.

As already stated, the Williams patent apparently comes nearer to a disclosure of Turner than any of the others; furthermore, it has received more attention, not only from counsel at the argument, but from the parties themselves, each of which manufactured a considerable number of valves in alleged conformity with the Williams patent, and thereupon submitted them to practical tests, the results of which were, as might naturally be expected, at variance. The complainant on its part claims that they were impracticable and useless and the defendant that they were reasonably successful—that is to say, that they were capable of making graduated application of the brake in service stops—although the operation of the triple valve throughout the train in service operations was not materially quicker than that of the old H triple valve. The explanation of the variant results of the experiments made by the complainant, and the defendant with the Williams valve, according to the evidence, appears to be this: That the complainant constructed its experimental valve strictly in accordance with the claims and specification of that patent, while the defendant admittedly made changes therein, which changes it claims, however, were not more or greater than would be suggested to a mechanic skilled in the art who desired to construct under the patent, practicable valves. One cannot read the evidence, however, without believing that the changes were not only material, but unwarranted, and were suggested not by anything taught by Williams, but by Turner. In other words, the teaching of Williams was in part at least, abandoned, and that of Turner adopted in several material respects, and that it was because of such changes the Williams valve was made capable of practical use. Turning to the evidence upon this question, it will be found that two practical expert witnesses testify on behalf of the complainant that at least five material changes were made in the Williams valve, as made by the defendant, changes without which they would have been impracticable and useless. The alterations just referred to were of the following character: By the first the train pipe vent ports were reduced to about one-tenth of the size shown by the drawings of the Williams patent, which change, moreover, according to the testimony, destroyed the declared purpose of that patent which was to save compressed air. A second change is found in the provision of an elongated slot or opening which formed a longer lost motion between the train pipe vent valve and the piston than between the piston and the graduating valve controlling the flow of reservoir air to the brake-cylinder. This change is of a material character, and was in no wise suggested by Williams. In Williams the graduating valves open and close simultaneously, whereas, by reason of the change just referred to, the auxiliary reservoir service port valve opens in advance of the train pipe vent port when the valve moves from lap position. In short, the relative movement of the graduating valves was changed by means of the elongated slot or

opening. A third change consisted in making the vent port graduating valve with a piston fit, by which the train pipe vent port is substantially closed, while the auxiliary reservoir port remains open. Hence they neither open nor close simultaneously. The effect of this change according to the experts is to give the engineer greater control over the train pipe graduating valve. A fourth departure consists in the alteration of the relation between the piston and the spring stem against which the piston abuts, whereby it was no longer necessary to compress the graduating spring in order to open the auxiliary reservoir service port. This also was contrary to what is set forth in the specification of the Williams patent. Upon this point one of the complainant's experts testifies as follows:

"The object of the change which I have referred to under the fourth paragraph heading above—that is, the change in the spring stem—is clearly the accomplishment of a different function and operation—that is, the return or lap movement of the mechanism of the device, instead of an over travel or cutting off action, which was the action contemplated by Williams, and referred to several times in his specification."

The fifth and last change which will be noticed consists in changing the location and position of the train pipe vent port in the valve seat with consequent changes in the relation of all the ports in the whole valve concerned in the operation of the triple valve. The effect of this change was to cause the train pipe vent port and the auxiliary reservoir vent port to open almost simultaneously, which prevents the sequence of operations described by Williams.

Speaking as a whole of the departures from the Williams patent above referred to, Mr. Turner, testifying as an expert for the complainant, says:

"The changes so far mentioned have as an object the attainment of four important features not disclosed in the Williams patent.

"First. The time and position of opening the train pipe vent port and the auxiliary reservoir service port.

"Second. The insurance that the auxiliary reservoir pressure can always fall at a more rapid rate than the train pipe can be caused to fall by or through the train pipe vent port.

"Third. The causing of the train pipe vent port to close while the auxiliary reservoir service port is still open; that is, in advance of the closing of the auxiliary reservoir service port by the lap movement of the graduating valve.

"Fourth. To insure that, after the valve has once opened and closed, that the auxiliary reservoir service port will reopen before the train pipe vent port."

And Mr. Synnestvedt, also an expert witness for the same party, says:

"In conclusion I will state with regard to the effect of the several structural changes above enumerated that it is, in substance, to transform the Williams device into a structure constituting a near approach to the device of the Turner patent here in suit as to certain of the main novel features of said Turner patent, and this mechanism, in my opinion, by virtue of the alterations in question, has ceased to be a Williams device, but, on the other hand, has a different law of operation, and fails to accomplish the object set forth by Williams. The altered construction referred to, in my opinion, is clearly a development produced in the light of the art, not as it existed prior to Turner's invention, but as it was changed by the disclosures of the Turner patent in suit, and the practice and experience of the art in connection with the commercial exploitation and use of the Turner valve."

A comparison of the Williams patent with the Turner patent, taken in connection with the testimony in relation thereto, and to the test of the Williams valve, shows that the Williams patent is not an anticipation of the patent under consideration, and since the Williams patent, as above stated, has been mainly relied upon to defeat Turner's, comparatively little attention need be given to the Dixon and Noyes and Moore patents. As already stated, it may be said of them all that they are, so far as appears by the record, but paper patents—that is to say, they have never been put to practical use—nor do their claims read upon or anticipate the claims in issue of the Turner patent. The devices of those patents are structurally and operatively different from that of Turner, and are incapable of performing the function of his patent. These facts are all conclusively shown by the evidence, and it seems unnecessary, therefore, to consider those patents in detail. It is undeniable that, if Williams did not anticipate Turner, the others do not.

No serious question is made as to the infringement of the claims in issue of this patent; indeed, it is practically admitted by the defendant's expert. A decree will accordingly be entered sustaining the patent and adjudging infringement by the defendant of the claims hereinabove specifically mentioned.

[2] The Turner and Custer patent, No. 912,512, remains for consideration. Claims 13, 15, and 16 are in issue. The patent upon its face is evidently of minor importance and value. The question for consideration is whether the patent is valid, for, if so, it has undoubtedly been infringed by the defendant. I think it is invalid. It discloses nothing of novelty or invention. It provides a check valve for preventing a back flow of air from the brake-cylinder to the train pipe. This had already been done in substantially the same way in emergency application of the brakes and the object of the patent under consideration was to apply the same check valve for the same purpose and in substantially the same way to service applications. In doing this the check valve performs no new function. It seems obvious that, in order to prevent the back flow of air in service applications, a mechanic skilled in the art would, under the circumstances, never have thought of adding another check valve, but would have avoided such duplication by the same means as those adopted by the patentees, or by other equivalent means. Even the patentees did not consider the problem one of much difficulty, as appears by the following extract from the specification:

"Another feature of this invention comprises a triple valve device having ports for locally venting the train pipe in service applications and means for preventing back flow from the brake cylinder through the local vent passage to the train pipe, whereby, after a full service application, the equalized brake-cylinder and auxiliary reservoir pressure cannot be reduced by flowing back to the train pipe in which the pressure may then be diminishing on account of leakage to the atmosphere. This result may be readily accomplished in the standard form of quick action triple valve device by merely connecting the local train pipe vent passage with the chamber between the usual emergency valve and check valve of the quick-action parts, whereby the regular check valve, in addition to its usual functions, will also act to prevent back flow through the local train pipe vent passage to the train pipe, and this comprises another feature of our invention."

They "merely" connected "the local train pipe vent passage with the chamber between the usual emergency valve and check valve of the quick action parts"; in other words, the air was conducted to a position where the check valve in the performance of its ordinary function would check it. No new parts were introduced. In view of the disclosures of the Westinghouse and the Williams and Moore patents, and of the slight changes made, involving mechanical skill only, I think the patent invalid.

A decree will be entered in favor of the complainant, sustaining the Turner patent as to the claims in issue, and adjudging them to have been infringed by the defendant, while the bill of complaint as to the Turner and Custer patent will be dismissed. Counsel will be heard upon the question of costs when the decree is presented for signature.